IN THE SUPREME COURT OF NORTH CAROLINA

No. 400A19

18 December 2020

STATE OF NORTH CAROLINA

v.

CAROLYN D. "BONNIE" SIDES

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 267 N.C. App. 653 (2019), finding no error after appeal from judgments entered on 16 November 2017 by Judge Beecher R. Gray in Superior Court, Cabarrus County. Heard in the Supreme Court on 31 August 2020.

*Joshua H. Stein, Attorney General, by Keith Clayton, Special Deputy Attorney General, for the State-appellee.*

*Glenn Gerding, Appellate Defender, by Wyatt Orsbon, Assistant Appellate Defender, for defendant-appellant.*

*Disability Rights North Carolina, by Susan H. Pollitt, Lisa Grafstein, and Luke Woollard, for Disability Rights North Carolina, North Carolina Psychiatric Association, and North Carolina Chapter of the National Alliance on Mental Illness, amici curiae.*

DAVIS, Justice.

The defendant in this case attempted suicide one evening after her trial had recessed for the day and was thereafter involuntarily committed. The trial court declined to hold a competency hearing and determined that she had voluntarily waived her constitutional right to be present at her trial as a result of the suicide attempt. Because we hold that the trial court erred by failing to conduct a competency

hearing under these circumstances, we reverse the decision of the Court of Appeals and remand for a new trial.

**Factual and Procedural Background**

Defendant was charged with four counts of felony embezzlement.[1] A jury trial began in Superior Court, Cabarrus County, on 6 November 2017. The State presented its case-in-chief the first three days of trial, during which time defendant was present in the courtroom. On the evening of 8 November 2017, defendant intentionally ingested 60 one-milligram Xanax tablets—thirty times her prescribed daily dose—in a suicide attempt at her home. She was found unresponsive and was taken to Carolinas HealthCare System NorthEast for treatment.

Defendant underwent medical evaluation that night by Dr. Kimberly Stover. Dr. Stover found that defendant "ha[d] been experiencing worsening depression and increased thoughts of self-harm" and sought defendant's immediate involuntary commitment, checking the box on the petition form stating that defendant was "mentally ill and dangerous to self or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." Dr. Stover also wrote that defendant "is not stable and for her safety will need further evaluation."

---

[1] Prior to trial, one of the counts was dismissed by the State.

A magistrate found reasonable grounds to believe defendant required involuntary commitment and signed a commitment order, which provided for an initial period of commitment of twenty-four hours beginning on the morning of 9 November 2017. A separate evaluation was conducted later that day by a psychiatrist, Dr. Rebecca Silver, after which Dr. Silver noted that defendant "remains suicidal even today. She is not safe for treatment in the community and requires inpatient stabilization."

That morning, the trial court was informed of defendant's suicide attempt and hospitalization. The trial court told the attorneys that it would try to "salvage" the day "without committing an error that'd be reversible." Defense counsel responded that a decision to proceed without defendant could not be made "without more information." The following exchange then transpired:

> THE COURT: It might be useful to have her record for the last two years or something from the hospital if she has a record of depression and treatment and all that, but that would probably—we'd get to some point where we start to need a medical expert to interpret—
>
> [DEFENSE COUNSEL]: Yeah.
>
> THE COURT: —what all that means.

Defense counsel informed the trial court that he had "been advised that [defendant] ha[d] a number of medical conditions by her and her family" and offered to attempt to obtain more information from her doctors. The trial court asked the State whether it was "aware of any case law that would give us some guidance on

whether this constitutes a voluntary absence or an involuntary [absence]." After the

State responded that it had not looked into the issue, the trial court stated as follows:

> But I think we plan to be back here Monday depending on what her situation is maybe and whether this—this absence, if we find out that this would constitute a voluntary absence, we'd probably go right on through Monday if it's clear.
>
> . . . .
>
> . . . If it's questionable, that would be something else, and we don't know if she could show up here Monday or not at this point.

Defense counsel once again offered to seek additional information about her

medical status and to conduct research on the issue of whether her absence should be

deemed voluntary. The trial court characterized the information received up to that

point—which was limited to the involuntary commitment documents—as "a bare-

bones examination, clear description of findings about two sentences, and that's it."

The trial court added that "[i]t takes more in depth when you get into the mental

aspect, a lot more in depth." The State had prepared a draft order compelling

production of certain portions of defendant's medical records to assist the trial court

in determining how to proceed. Referencing that draft order, the State stated the

following:

> But I'd assume, if that order were signed by the Court, that we could find out some information as to how she got there, you know, what she presented with, what, you know, past symptoms, medications that she could have been on. I think it would really open up a wealth of information that

this Court could use in being well-informed to make a decision in this case.

A discussion ensued concerning the fact that the proposed order only sought information regarding defendant's condition on 8 and 9 November 2017. Defense counsel stated as follows:

> [Y]ou may want to expand the order a little bit, but I believe that what the order says is all information, complete documentation, complaint, diagnosis, treatment, prognosis, discharge and any other information that would assist the Court. I think that's rather complete, but it's the Court's order. But I think, you know, if you want to—if you want to put in including current updates to the date and time of the release or current updates through her discharge—

The trial court agreed, deciding that the order should be "comprehensive." The trial court then recessed the proceedings while the State drafted a revised order for the release of defendant's medical records and conducted research on whether the trial should continue.

When the proceedings resumed that afternoon, the State informed the trial court of its position that defendant had voluntarily waived her right to be present by choosing to ingest the excessive number of pills. Defense counsel expressed his belief that there was a need for more information regarding defendant's mental health status, noting that it was not clear whether "her intent was to end her life or to impede these proceedings." The trial court agreed to recess further trial proceedings until the following Monday, at which time defendant would either be released from

treatment or the trial court would have received the requested medical records. The

trial court then stated the following:

> We don't know what her situation is going to be, but I want
> to take the position, unless something happens that shoots
> it down, that she voluntarily made herself absent from the
> trial and continue on Monday.

The trial court proceeded to release the jury until the following Monday and

issued an order for defendant's arrest upon the expiration of her period of

commitment. Later that afternoon, the trial court also entered an order for the release

of defendant's medical records. The trial court mandated the production of "complete

documentation of the Defendant's complaint, diagnosis, treatment, prognosis,

discharge, and any other information that would assist the court in making a

determination regarding how to proceed," but limited the temporal scope of the

records to the "admittance date of November 8, 2017, and any days following this date

for the continued treatment of [defendant]."

The proceedings resumed on 13 November 2017 at which time defendant

remained in the hospital under the terms of the involuntary commitment order. The

trial court informed counsel that it had received 89 pages of defendant's recent

medical records over the weekend, which included reports containing the medical

opinions of Dr. Silver and Dr. Stover, which both stated that defendant required

further immediate inpatient psychiatric stabilization and that she remained suicidal.

The records also noted that defendant had been assessed at a "high" risk level on the

Columbia Suicide Severity Rating Scale. An evaluation by Dr. Silver stated, in part, that

> [s]he has been on trial for embezzlement . . . .
>
> . . . .
>
> The patient reported that the verdict for her trial was to be read out this morning, November 9. She states that last night she wrote goodbye letters to her grandchildren, and overdosed on 60 tablets of Xanax. She had stated "I'm not going to go to jail".
>
> . . . .
>
> . . . She states she continues to think about wishing she were dead reporting "I don't really have a will to live". . . .
>
> . . . .
>
> . . . She denies any history of suicide attempts before last nights overdose on Xanax.

The medical records also reflected defendant's "history of a mood disorder" that she managed with daily medication but noted that she had "never been psychiatrically hospitalized." In addition, the medical records stated that defendant had been prescribed Haldol for agitation, as well as Vistaril for anxiety and Trazodone to help her sleep. She was ordered to continue her prescription of 100 milligrams of Zoloft daily.

The following exchange between the trial court and defense counsel then ensued:

THE COURT: Up till the time that this matter occurred, [defense counsel], you have not observed anything of her that would indicate she lacked competency to proceed in this trial, would that be a fair statement?

[DEFENSE COUNSEL]: That would be a fair statement.

THE COURT: Okay. And then this intervention came along Wednesday?

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: And we are where we are now—

[DEFENSE COUNSEL]: Yes.

THE COURT: —she's being further evaluated?

[DEFENSE COUNSEL]: That's correct, yes.

THE COURT: All right. It's my intention this morning as I stated I think Thursday to proceed with the trial under the ruling that she has voluntarily by her own actions made herself absent from the trial at this point. How it may be in the future I'm not sure, depends on her situation how it all turns out, but I'm taking the position that she has by her voluntary actions and by implication made her presence unavailable for court.

Defense counsel then stated the following:

Your Honor, I would indicate that we did review on Thursday an involuntary commitment document indicating that the doctor put on the record that she had voluntarily overdosed on Xanax by taking 60 milligrams. I contend that it is somewhat of a leap for us as lay people and not doctors to consider that her actions are for the purposes of avoiding jurisdiction of the court or avoiding trial. Ms. Sides has quite a number of other factors in her life that are very pressing and from which certain personalities may find overwhelming. I would just contend,

Your Honor, that this may be the straw that broke the camel's back, but I don't know that her efforts—I think her efforts were to end her life, not to end her trial.

And I would contend that we don't have evidence regarding whether or not she voluntarily absented herself from the trial. We know that she attempted to absent herself from life itself, but I would contend that there is some distinction of that, that she is in custody in a medical facility, and we have not investigated whether or not she chooses or would like to be here. And so we're making a leap by saying that she voluntarily absented herself from the trial, and we'd like to note our objection to that.

Over defense counsel's objection, the trial court ruled that the trial would proceed on the basis that defendant's absence was voluntary. The trial court admitted into evidence defendant's medical records and the involuntary commitment documents, noting that it had considered those documents. The trial then resumed without defendant being present, and the jury was instructed not to consider defendant's absence in weighing the evidence or determining the issue of guilt. At the close of the State's case-in-chief, defense counsel moved to dismiss the charges against her, and the trial court denied the motion. No evidence was offered on defendant's behalf. The trial court subsequently denied defense counsel's renewed motion to dismiss. That afternoon, the jury reached a verdict finding defendant guilty of all charges.

On 16 November 2017, defendant appeared in the courtroom for sentencing. The trial court sentenced her to consecutive sentences of 60 to 84 months imprisonment for the two Class C felonies and 6 to 17 months imprisonment for the

Class H felony. The trial court suspended the latter sentence and imposed 60 months supervised probation. Finally, the trial court ordered defendant to pay $364,194.43 in restitution. On 28 November 2017, defendant gave notice of appeal.

Before the Court of Appeals, defendant argued that the trial court was required to conduct a competency hearing prior to proceeding with the trial in her absence. Relying on its prior decision in *State v. Minyard*, 231 N.C. App. 605 (2014), the majority at the Court of Appeals rejected this contention, holding that when a defendant voluntarily absents herself from trial, she waives her constitutional right to be present and is not entitled to a competency hearing. *State v. Sides*, 267 N.C. App. 653, 658 (2019). The majority concluded that defendant's overdose was a voluntary act and that no competency hearing was required under the circumstances. *Id.* at 661.[2]

In a dissenting opinion, Judge Stroud stated her belief that a defendant must be found to be competent before she can be deemed to have voluntarily absented herself from trial and that substantial evidence had existed before the trial court casting doubt on defendant's competence. *Id.* at 664 (Stroud, J., dissenting). As a result, Judge Stroud expressed her view that the trial court was required to sua

---

[2] The Court of Appeals also rejected defendant's additional argument that the trial court had erred by amending the judgments entered against her in her absence in order to reflect corrected offense dates. *See State v. Sides*, 267 N.C. App. 653, 663 (2019). That issue, however, is not before us in this appeal.

sponte conduct a competency hearing in this case. *Id.* at 666. On 18 October 2019, defendant appealed as of right to this Court based upon the dissent.

**Analysis**

This case requires us to reconcile the following four principles based on the facts of this case: (1) a criminal defendant cannot be tried unless she is competent to stand trial; (2) a defendant has a constitutional right to be present during her entire trial; (3) a defendant may voluntarily waive her constitutional right to be present; and (4) such a waiver is only valid if the defendant is competent. Stated succinctly, in this appeal we must resolve a classic "chicken and egg" dilemma regarding how a trial court must proceed when faced with a situation where a defendant intentionally engages in conduct harmful to herself that has the effect of absenting her from trial under circumstances that raise bona fide concerns about her capacity. In such cases, the issue is whether the trial court is required to conduct a competency hearing before proceeding to determine whether the defendant made a voluntary waiver of her right to be present, or, alternatively, whether it is permissible for the trial court to forego a competency hearing and instead assume a voluntary waiver of the right to be present on the theory that the defendant's absence was the result of an intentional act.

We conclude that by essentially skipping over the issue of competency and simply assuming that defendant's suicide attempt was a voluntary act that constituted a waiver of her right to be present during her trial, both the majority at

the Court of Appeals and the trial court "put the cart before the horse." Once the trial court had substantial evidence that defendant may have been incompetent, it should have sua sponte conducted a competency hearing to determine whether she had the capacity to voluntarily waive her right to be present during the remainder of her trial.

We first address the State's contention that defendant failed to preserve her statutory right to a competency hearing. Subsection 15A-1001(a) of the General Statutes of North Carolina states that

> [n]o person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

N.C.G.S. § 15A-1001(a) (2019).

The issue of whether a defendant has the capacity to be tried "may be raised at any time on motion by the prosecutor, the defendant, the defense counsel, or the court." N.C.G.S. § 15A-1002(a) (2019). Our General Statutes provide that once a question is raised as to a defendant's capacity, "the court shall hold a hearing to determine the defendant's capacity to proceed." N.C.G.S. § 15A-1002(b)(1). Defendant contends that a competency hearing was required under this statute because both defense counsel and the trial court raised the issue of defendant's competency and defense counsel objected to the trial court's ultimate decision to allow the trial to proceed.

The State, conversely, argues that defendant's statutory right to a competency hearing pursuant to N.C.G.S. § 15A-1002(b) was waived because defense counsel neither actually requested such a hearing nor properly objected to the trial court's decision to proceed without one. In support of its argument, the State cites several decisions from this Court in which we held that a defendant's statutory right to a competency hearing was not properly preserved. *See State v. Badgett*, 361 N.C. 234 (2007); *State v. King*, 353 N.C. 457 (2001); *State v. Young*, 291 N.C. 562 (1977).

However, we need not resolve the parties' dispute regarding the preservation issue. Even assuming arguendo that the State is correct that defendant failed to preserve her *statutory* right to a competency hearing as required under our prior decisions, we hold that defendant possessed a *constitutional* due process right to such a hearing.

The United States Supreme Court has held that a defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." *Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) (cleaned up). In situations where a trial court possesses information regarding a defendant that creates "sufficient doubt of his competence to stand trial to require further inquiry on the question," it must investigate the competency issue. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). This Court has likewise recognized that "[a] trial court has a constitutional duty to institute, *sua sponte*, a competency hearing

-13-

if there is substantial evidence before the court indicating that the accused may be mentally incompetent." *Young*, 291 N.C. at 568 (emphasis omitted) (citation omitted). Because questions of competency can arise for the first time during trial, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181.

In addition, although a criminal defendant possesses a constitutional right to be present at all stages of her trial, *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), the United States Supreme Court has also recognized the potential for a defendant in a non-capital case to waive that right.

> [W]here the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if he were present.

*Taylor v. United States*, 414 U.S. 17, 19 (1973) (alteration in original) (citation omitted).

The Supreme Court has made clear that in order to waive the right to be present, however, the defendant "must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away." *Id*. at 19 n.3 (citation omitted). In other words, in order to waive

the right to be present, there must be "an intentional relinquishment or abandonment" of that right. *Id.* at 19 (citation omitted). The Supreme Court has recognized that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Pate v. Robinson*, 383 U.S. 375, 384 (1966).

Here, the majority at the Court of Appeals reasoned that defendant waived her right to be present by voluntarily absenting herself from trial. *Sides*, 267 N.C. App. at 661. Specifically, the majority held that the trial court was not required to conduct a competency hearing because defendant waived her right to be present at trial by intentionally overdosing on medication, thereby resulting in her absence through her own willful conduct. *Id.* at 659–60.

We believe that the Court of Appeals erred by making that determination without first deciding whether there was substantial evidence before the trial court as to her lack of capacity to truly make such a voluntary decision. As the case law discussed above makes clear, a defendant cannot be deemed to have voluntarily waived her constitutional right to be present at her own trial unless she was mentally competent to make such a decision in the first place. Logically, competency is a necessary predicate to voluntariness. Accordingly, if there is substantial evidence suggesting that a defendant may lack the capacity to stand trial, then a sufficient inquiry into her competency is required before the trial court is able to conclude that she made a voluntary decision to waive her right to be present at the trial through

her own conduct. Thus, the majority at the Court of Appeals erred by simply assuming that defendant's suicide attempt was necessarily a voluntary act.

Although the majority's analysis was flawed in this respect, the question remains whether it nevertheless ultimately reached the correct result. In order to answer that question, we must determine whether a bona fide doubt actually existed as to defendant's lack of competency that required the trial court to sua sponte conduct a competency hearing before allowing the trial to resume in her absence.

In addressing this issue, we deem it instructive to review prior decisions of this Court that address the question of whether the trial court was constitutionally required to initiate a competency hearing sua sponte. In *Young*, the defendant was convicted of first-degree murder and sentenced to death. *Young,* 291 N.C. at 565. Before trial, defense counsel raised concerns about the defendant's competency. *Id.* at 566. The trial court ordered that the defendant be committed to Dorothea Dix Hospital to undergo psychiatric examination. *Id.* at 566. The resulting diagnostic report and psychiatric opinions identified no evidence of incompetency. *Id.* at 566–67. On appeal to this Court, the defendant contended that the trial court had erred by not holding a competency hearing, citing both his statutory and due process rights. We concluded that the defendant waived his statutory right to such a hearing as there was "no indication that the failure to hold a hearing under G.S. 15A-1002(b)(3) . . . was considered or passed upon by the trial judge." *Id.* at 567–68. We further held that defendant was not constitutionally entitled to such a hearing because where "the

defendant has been committed and examined relevant to his capacity to proceed, and all evidence before the court indicates that he has that capacity, he is not denied due process by the failure of the trial judge to hold a hearing subsequent to the commitment proceedings." *Id.* at 568.

The defendant in *State v. Heptinstall*, 309 N.C. 231 (1983), was convicted of first-degree murder. Prior to trial, the trial court conducted an inquiry into his competency and reviewed evidence of his "significant history of mental illness," including a diagnosis of paranoid schizophrenia. *Heptinstall*, 309 N.C. at 233. Family members and a forensic psychiatrist testified to the defendant's bizarre behavior, but the trial court found him competent and proceeded with trial. *Id.* at 233–34. The defendant contended on appeal that the trial court should have conducted another competency hearing after his "bizarre and incoherent" testimony. *Id.* at 235.

We rejected this argument, stating that the defendant's testimony "became nonsensical and bizarre when the subject turned to matters of morality and religion" but that otherwise "[a]lmost all of his testimony during the guilt phase indicates that defendant was accurately oriented regarding his present circumstances." *Id.* at 236. We concluded that "the testimony would not have suggested to the trial court that defendant then lacked capacity to proceed. There was, therefore, no duty of the trial court on its own motion to reopen this question." *Id.* at 237.

In *King*, the defendant was convicted of first-degree murder for killing his estranged wife, and he was sentenced to death. *King,* 353 N.C. at 461. He argued on

appeal that the trial court erred by not conducting a competency hearing prior to trial. *Id*. at 465. This Court held that the defendant waived his statutory right to a competency hearing and was not constitutionally entitled to such a hearing because there was not substantial evidence suggesting that he may have been incompetent. *Id*. at 466–67. We noted that the record did "not indicate that either defendant or defense counsel raised any questions about defendant's capacity to proceed at any time during defendant's trial and capital sentencing proceeding." *Id*. at 467. Although the defendant offered some evidence of past "precautionary treatment for depression and suicidal tendencies," we concluded that this alone did not constitute substantial evidence that the defendant lacked the capacity to proceed and that, as a result, the trial court did not have a duty to sua sponte conduct a competency hearing. *Id*.

The defendant in *Badgett* was sentenced to death for first-degree murder. *Badgett,* 361 N.C. at 239. On appeal to this Court, he argued that the trial court erred by not sua sponte conducting a competency hearing in light of doubts as to his competency. *Id*. at 258. After being charged with first-degree murder, the defendant had sought counseling and was found by psychiatrists to suffer from irritability, anger management problems, and depression. *Id*. at 241–42. On appeal, the defendant attempted to rely on evidence that he had written letters to the trial court asking for a speedy trial resulting in a death sentence, impliedly asked the jury to sentence him to death, and engaged in an emotional outburst during sentencing. *Id*. at 259–60.

This Court rejected the defendant's argument that he was statutorily entitled to a competency hearing because nothing in the record indicated that questions of competency were raised at any point during trial. *Id.* at 259. With regard to the question of whether he had a constitutional right to a competency hearing, we noted that he had "interact[ed] appropriately with his attorneys during the trial. . . . conferred with them . . . . followed their advice . . . . [and] responded directly and appropriately to questioning." *Id.* at 260. Furthermore, the transcript revealed that the defendant "demonstrated a strong understanding of the proceedings against him" and treated the trial court with deference. *Id.* at 260. Moreover, although he did, in fact, have an "outburst during the state's closing arguments," he apologized afterward and "calmly and rationally" explained why he was upset. *Id.* at 260–61. Finally, we recognized that three experts testified about defendant's psychological history and none of them suggested that his mental status rendered him incompetent to stand trial. *Id.* at 261. For these reasons, we concluded that no competency hearing was required. *Id.* at 260.

While our holdings in *Young*, *Heptinstall*, *King*, and *Badgett* provide useful guidance on the basic legal principles that govern the present case, we believe several decisions of the federal courts—including two from the United States Supreme Court—are more directly relevant to our analysis. In *Drope*, on the second morning of trial for a rape charge, the defendant shot himself in the stomach in an attempt to commit suicide and was hospitalized. *Drope*, 420 U.S. at 166–67. The remainder of

the trial proceeded in his absence with the trial court ruling that his absence was voluntary in light of evidence that he had stated he would "rather be . . . dead than to go to trial for something he didn't do." *Id*. at 167. The jury found the defendant guilty, and the trial court sentenced him—after he finally appeared in court after a three-week hospital stay—to life in prison. *Id*.

The defendant argued on appeal that the trial court denied him his right to due process by failing to conduct a competency hearing in light of the circumstances surrounding his absence from trial. *Id*. at 163–64. The Supreme Court noted that the defendant "was absent for a crucial portion of his trial," which prevented the trial court from observing his behavior, *id*. at 180–81, and that "the record reveal[ed] a failure to give proper weight to the information suggesting incompetence which came to light during trial." *Id*. at 179. The defendant's wife had testified to her "belief that her husband was sick and needed psychiatric care" and that he tried to choke and kill her the night before trial. *Id*. at 166.

The Supreme Court recognized that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required" but noted there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Id*. at 180. The Supreme Court determined that it "was sufficiently likely that, in light of the evidence of [the defendant's] behavior including his suicide attempt, and there being no opportunity without his

presence to evaluate that bearing in fact, the correct course was to suspend the trial until such an evaluation could be made." *Id.* at 181. The Supreme Court concluded that "when considered together with the information available prior to trial and the testimony of [the defendant's] wife at trial, the information concerning [the defendant's] suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question." *Id.* at 180. The Supreme Court therefore reversed the judgment and remanded the case for a new trial. *Id.* at 183.

In *Pate*, the defendant was convicted of murdering his wife and was sentenced to life imprisonment. *Pate,* 383 U.S. at 376. At trial, defense counsel asserted the defense of insanity and contended that the defendant was incompetent to stand trial, but the trial court did not conduct a competency hearing. *Id.* The United States Supreme Court held that the defendant "was constitutionally entitled to a hearing on the issue of his competence to stand trial." *Id.* at 377. The Supreme Court cited testimony from four witnesses regarding the defendant's "history of disturbed behavior," including instances of erratic conduct and paranoia. *Id.* at 378–79. In addition, the Supreme Court noted that the trial court had heard evidence of the defendant's prior psychiatric hospitalizations and a hospitalization resulting from an attempted suicide by gunshot to the head. *Id.* at 380–81. The Supreme Court acknowledged evidence that the defendant had exhibited "mental alertness and understanding" in his exchanges with the trial court, but it observed that even though the defendant's "demeanor at trial might be relevant to the ultimate decision as to

his sanity, it cannot be relied upon to dispense with a hearing on that very issue." *Id.* at 385–86. The Supreme Court ultimately concluded that based on the record, the defendant's "present sanity was very much in issue" during the proceedings, thereby raising a " 'bona fide doubt' as to [the] defendant's competence to stand trial" such that he was entitled to a competency hearing. *Id.* at 384–85.

The United States Court of Appeals for the Ninth Circuit addressed a similar issue in *United States v. Loyola-Dominguez*, 125 F.3d 1315 (9th Cir. 1997). In that case, the defendant attempted suicide in his jail cell the night before trial. *Id.* at 1316. The next morning, defense counsel requested that the defendant undergo a psychiatric evaluation and a competency hearing, citing some additional mental health difficulties that the defendant had experienced during his incarceration. *Id.* The trial court briefly questioned the defendant, asking him whether he would like to undergo psychiatric evaluation or continue with trial. *Id.* At one point, the trial court asked the defendant the following: "Well, do you feel—do you know what's going on? Do you know what's going on at the trial?" The defendant replied: "I don't know. I've never been here like this, so I don't know." *Id.* at 1317. The trial court then inquired as to whether the defendant felt that he was "competent to understand what's going on," and the defendant asked: "How long would it take? Because I just can't stand anymore, the way they have me there. I feel desperate." *Id.* The trial court ultimately ordered that the trial proceed without a competency hearing. *Id.*

-22-

In holding that the trial court had erred by failing to hold a competency hearing, the Ninth Circuit stated that "[w]hile we do not believe that every suicide attempt inevitably creates a doubt concerning the defendant's competency, we are persuaded that, under the circumstances of this case, such a doubt existed." *Id.* at 1318–19. The Ninth Circuit determined that the trial court's inquiry was insufficient to assess the defendant's competency, particularly "the fact that the trial court did not elicit adequate information, from either defense counsel or [the defendant], that would have dispelled the concerns that would ordinarily arise regarding competency." *Id.* at 1319. The Ninth Circuit further explained that the defendant's responses to the trial court's questions suggested that he did not fully understand the nature and consequences of the proceedings. *Id.* Although the trial court noted that the defendant "had always seemed fine in the past," the Ninth Circuit concluded that the defendant's recent suicide attempt along with the surrounding circumstances "raised significant doubts regarding his competency to stand trial" such that a competency hearing was constitutionally required. *Id.*

Based on our thorough review of the record in the present case, we believe the trial court was presented with substantial information that cast doubt on defendant's competency. To be sure, defendant's suicide attempt itself "suggests a rather substantial degree of mental instability contemporaneous with the trial." *Drope*, 420 U.S. at 181. But her suicide attempt does not stand alone in our assessment. *See*

*id.* In our view, the facts before the trial court—when taken as a whole—were clearly sufficient to trigger the need for a competency hearing.

On the morning of 9 November 2017, the trial court was made aware that defendant had been hospitalized after a suicide attempt and that a magistrate had determined that grounds existed to issue an order for her involuntary commitment. The trial court reviewed two psychiatric opinions regarding defendant's mental health issues. Dr. Stover, the doctor who sought defendant's immediate involuntary commitment, found that defendant "ha[d] been experiencing worsening depression and increased thoughts of self-harm" and checked the box on the form stating that defendant was "mentally ill and dangerous to self or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." Dr. Stover wrote that defendant "is not stable and for her safety will need further evaluation." Dr. Silver conducted another evaluation of defendant later that day and noted that defendant "remains suicidal even today. She is not safe for treatment in the community and requires inpatient stabilization."

Upon receiving this information, the trial court issued an order for the release of additional medical records—albeit only those records from 8 November 2017 onward. These records, which were reviewed by the trial court, shed additional light on defendant's mental health issues, showing that defendant had a "history of a mood disorder" that she managed with daily medication. In the meantime, defendant

remained suicidal and was assessed at a "high" risk level on the Columbia Suicide Severity Rating Scale, and she told Dr. Silver that she did not "really have a will to live." As part of her inpatient treatment, she was prescribed Haldol along with Vistaril and Trazodone. Defendant was also instructed to continue her daily dose of 100 milligrams of Zoloft.

It is clear that the trial court recognized the existence of an issue as to defendant's competency. For this reason, the trial court took the initial steps of recessing trial proceedings, conferring with counsel, and ordering the production of defendant's most recent medical records. But instead of ordering a hearing on defendant's competency, the trial court at that point abruptly ended further consideration of the issue, simply assuming—like the Court of Appeals majority— that her overdose was a voluntary action and that no further competency analysis was required. Simply put, the trial court started down the road of addressing defendant's competency but abandoned the journey midway.

In arguing that no competency hearing was required, the State points to evidence in the record suggesting that defendant's ingestion of pills was a voluntary attempt by her to avoid incarceration upon being convicted. The State supports this argument, for example, by citing a statement she made to medical providers during her hospitalization that she is "not going to go to jail."

By making this argument, however, the State is conflating the separate issues of (1) whether substantial evidence existed as to defendant's lack of competency so as

to require a sua sponte competency hearing, and (2) what the ultimate result of such a competency hearing would be. But the latter issue is not before us. Rather, the sole question that we must decide is whether there was substantial evidence before the trial court to trigger the need for a sua sponte competency hearing in the first place. After hearing all of the relevant evidence as to defendant's competency at such a hearing, the trial court would then have been tasked with weighing the respective evidence—including those facts that the State highlights in its brief before this Court—and making a competency determination. Assuming defendant was found to be competent, then—and only then—would the trial court have been able to make a determination as to whether defendant's absence from the trial proceedings was the result of a voluntary act on her part.[3]

We wish to emphasize that the issue of whether substantial evidence of a defendant's lack of capacity exists so as to require a sua sponte competency hearing requires a fact-intensive inquiry that will hinge on the unique circumstances presented in each case. Our holding should not be interpreted as a bright-line rule that a defendant's suicide attempt automatically triggers the need for a competency

---

[3] In its analysis, the Court of Appeals majority relied largely on that court's prior decision in *State v. Minyard*, 231 N.C. App. 605 (2014). In *Minyard*, the Court of Appeals held, in part, that a defendant who had ingested a large quantity of intoxicating substances at the end of his trial had voluntarily waived his right to be present during the jury's deliberations. *Id.* at 626–27. To the extent the Court of Appeals' analysis on that issue is inconsistent with our holding today, that portion of *Minyard* is overruled.

hearing in every instance. Rather, our decision is based on our consideration of all the evidence in the record when viewed in its totality.

\* \* \*

The only remaining issue before us is to determine the appropriate remedy on remand. The two potential remedies are for the trial court to conduct either a new trial or a retrospective competency hearing.

The United States Supreme Court has recognized "the difficulty of retrospectively determining an accused's competence to stand trial." *Pate*, 383 U.S. at 387. Where a retrospective hearing would require the trial court to assess the defendant's competency "as of more than a year ago," the Supreme Court has suggested that such a hearing is not an appropriate remedy. *Dusky v. United States*, 362 U.S. 402, 403 (1960).

Here, a retrospective hearing would require an evaluation of defendant's competency more than three years ago. Because of the "inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances," *Drope*, 420 U.S. at 183, we do not believe such an undertaking would be feasible. We conclude that defendant is entitled to a new trial—"assuming, of course, that at the time of such trial [defendant] is competent to be tried." *Id*.

## Conclusion

For the reasons stated above, we reverse the decision of the Court of Appeals and remand for a new trial.

REVERSED AND REMANDED.

Justice MORGAN dissenting.

While I agree with my learned colleagues in the majority that "the sole question that we must decide is whether there was substantial evidence before the trial court to trigger the need for a *sua sponte* competency hearing," I disagree with their evaluation of defendant's mental health history as constituting a determination that "the trial court had substantial evidence that defendant may have been incompetent." I am also in accord with the majority's approach in a case such as the current one that "the issue of whether substantial evidence of a defendant's lack of capacity exists so as to require a *sua sponte* competency hearing requires a fact-intensive inquiry that will hinge on the unique circumstances presented in each case," although I do not consider the particular features of this case to compel the need for the trial court to hold a competency hearing. The majority's tendency here to embellish aspects of defendant's mental history and capacity, plus its tendency to diminish aspects of defendant's pre-trial and trial behavior, artificially create a specter of substantial evidence which I do not perceive in this case. As a result, I dissent.

The Due Process Clause of the United States Constitution protects criminal defendants who are incompetent to stand trial for charges levied against them by the State from being compelled to stand trial while they remain incompetent. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). In order to possess the competence necessary to

stand trial, a defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). While "a competency determination is necessary only when a court has reason to doubt the defendant's competency," *Godinez v. Moran*, 509 U.S. 389, 401 n.13 (1993), North Carolina criminal courts have a "constitutional duty to institute, *sua sponte*, a competency hearing *if there is substantial evidence before the court* indicating that the accused may be mentally incompetent." *State v. Badgett*, 361 N.C. 234, 259, 644 S.E.2d 206, 221 (2007) (quoting *State v. King*, 353 N.C. 457, 467, 546 S.E.2d 575, 585 (2001)). Substantial evidence which establishes a bona fide doubt as to a defendant's competency may be established by considering "a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope*, 420 U.S. at 180. Indeed, as the majority quotes from *Drope*, a suicide attempt "suggests a rather substantial degree of mental instability contemporaneous with trial." *Id.* at 181.

The majority in the present case recounts defendant's mental health history prior to trial and delineates her unfortunate and sobering background of agitation, anxiety, and depression, and her "history of mood disorder." In its analysis, the majority sees fit to equate such circumstances as those which existed in *Drope*, in which the majority here cites the Supreme Court of the United States' emphasis on the testimony of the defendant's wife that she believed that defendant " 'was sick and

needed psychiatric care' and that he tried to choke and kill her the night before trial," as well as those in *Pate v. Robinson*, 383 U.S. 375 (1966), wherein the majority here cites the Supreme Court of the United States' emphasis on the defendant's " 'history of disturbed behavior,' including instances of erratic conduct and paranoia . . . [and] defendant's prior psychiatric hospitalizations and a hospitalization resulting from an attempted suicide by gunshot to the head," with defendant's circumstances in the case sub judice in order to substantiate the majority's conclusion here that there was a bona fide doubt about defendant's competency to stand trial so as to require the trial court to conduct a *sua sponte* competency hearing. The breadth and depth of the mental health challenges experienced by defendants in *Drope* and *Pate* were at a more extreme level than those mental health challenges experienced by defendant in the present case, although the majority stretches the magnitude of defendant's circumstances to qualify for the application of the competency hearing requirement articulated by the nation's highest court.

As my distinguished colleagues in the majority magnify the significance of defendant's mental health history to elevate it to the reaches of the *Drope* and *Pate* principles governing the existence of substantial evidence to require a trial court's *sua sponte* competency hearing to be conducted, they simultaneously bolster the perception of the presence of substantial evidence that defendant may have been incompetent by providing scant recognition of defendant's behavior that detracts from a determination of substantial evidence. The information gathered by the trial court

in conjunction with defendant's apparent drug overdose showed that defendant had "never been psychiatrically hospitalized," that defendant herself denied any history of suicide attempts prior to her apparent drug overdose, and that defendant reported that she took the drugs in an effort to kill herself following the end of the third day of her trial because defendant was aware that "the verdict for her trial was to be read out this morning" and defendant had stated "I'm not going to jail." The majority's expansive reading of defendant's limited mental health history, combined with her singular suicide attempt brought on by a professed desire to avoid incarceration, does not appear to sufficiently demonstrate, in my view, defendant's inability "to understand the nature and object of the proceedings against [her], to consult with counsel, and to assist in preparing [her own] defense," which is the standard for competency as instructed by the Supreme Court in *Drope*. *Drope*, 420 U.S. at 171. Substantial evidence of a defendant's incapacity to stand trial is inadequately shown where generalized mental health issues, rather than the *Drope* delineation of factors, is shown to exist. I do not consider the standard articulated by *Drope* to have been met in the present case.

With the dearth of any information to signify that defendant was incompetent and defendant's unequivocal statement that her apparent drug overdose was a singular suicidal event to avoid the prospect of incarceration, the trial court determined that defendant's absence from trial was accomplished by her voluntary actions which constituted a waiver of defendant's constitutional right to be present

at her criminal trial. The modest attention which the majority has given to these core considerations of the trial court and the Court of Appeals in those forums' respective and compatible determinations that defendant was not entitled to a competency hearing under the totality of these circumstances, while bolstering the specter of the existence of substantial evidence to require the trial court to conduct a *sua sponte* competency hearing, unfortunately decreases the standard for establishment of such substantial evidence and increases the myriad of situations in which a trial court must interrupt a criminal trial to conduct a *sua sponte* competency hearing when a defendant creates a voluntary absence from trial.

The majority mistakenly conflates defendant's *willingness* to participate in her criminal trial with her *ability* to do so. In light of this and the additional aforementioned reasons, I respectfully dissent.

Justice NEWBY and Justice ERVIN join in this dissenting opinion.